WILLIAM G. BRENNECKE v. GANAHL LUMBER COMPANY, Appellant.—
44 S. W. (2d) 627.

Division One, December 21, 1931.

*Banister, Leonard, Sibley & McRoberts* and *Frank P. Aschemeyer* for appellant.

*Foristel, Mudd, Blair & Habenicht* for respondent.

FERGUSON, C.—Action for damages. for personal injuries alleged to have been sustained by plaintiff while employed by defendant. The third amended petition upon which the case was tried is in two counts, each stating a separate and distinct cause of action.

The first count charges that plaintiff was in defendant's employ and on the 17th day of March, 1925, was assigned to work in close proximity to a combustion engine which was then in operation and which emitted noxious and poisonous gases and fumes containing carbon monoxide gas; that the engine was not properly and sufficiently equipped with exhaust pipes to carry the gases away and that the air about the place where plaintiff was required to work became permeated with poisonous gases, so that plaintiff, breathing the air so charged and permeated with poisonous gases, sustained carbon monoxide poisoning causing him serious and permanent injuries. Defendant is charged with a breach of its duty to furnish plaintiff a reasonably safe place in which to work in that it negligently failed to equip the exhaust on the engine with pipes to carry away the gases emitted; negligently failed to provide a means of ventilation by which the noxious and poisonous gases could be prevented from accumulating "at or about the place where plaintiff was required to work" and negligently failed to warn plaintiff of the danger from the discharge by the engine of poisonous gases at or about the place where he was working. The first count prays damages in the sum of $15,000.

The second count of the petition charges that plaintiff sustained injuries on the 30th day of June, 1925, caused by carbon monoxide poisoning on that date under substantially the same circumstances alleged in the first count. The allegations of negligence made in the second count are identical with those set out in the first count. The second count prays damages in the sum of $25,000.

In its answer to the first count defendant, after a general denial, pleads a written release by plaintiff under date of April 14, 1925, "releasing and discharging the defendant from any and all claims or causes of action on account of personal injuries sustained by plaintiff on the 17th day of March, 1925, while in the employment of defendant."

By reply plaintiff denied the allegations of the answer setting up a release in bar of the cause of action set out in the first count and alleged that if he signed the purported release "he had no knowl-

edge of its contents and was induced to sign said instrument by fraudulent statements, promises and inducements made" to him by the agent of a liability insurance company in the manner and under circumstances detailed.

Defendant's answer to the second count is a general denial.

The jury found for plaintiff, on both counts of the petition, awarding damages on the first count in the sum of $10,000 and on the second count in the sum of $15,000. From the judgment for $25,000 the defendant appealed.

Most of the testimony bearing upon respondent's alleged injuries and the nature and extent thereof related to the injuries charged to have been caused by and resulting from the inhalation by plaintiff of carbon monoxide gas on June 30, 1925. All of appellant's assignments of error, which are briefed, with one exception, relate to the first count, the only assignment of error as to the second count being that the verdict on that count is grossly excessive.

At the time he received the injuries alleged to have been sustained on March 17, 1925, and which is the basis of the cause of action set out in the first count of the petition, plaintiff was fifty-six years of age and was employed by the defendant as a carpenter at a wage of $7.50 per day. On that date he was assigned by his foreman to work at a "boring machine," in the box factory, at defendant's plant in the city of St. Louis. This machine was operated with power supplied by a ten-horse power, coal oil, combustion engine. A concrete foundation for this engine was being constructed and the engine had been moved and placed on a temporary foundation within four or five feet of the "boring machine." Prior to the time the engine was moved it was equipped with an exhaust pipe which carried gases and fumes from the exhaust outside of the building. When the engine was moved to the temporary foundation the exhaust pipe was disconnected and had not been replaced on March 17th. The plaintiff testified that as he worked at the boring machine on that morning he could feel the exhaust from the engine striking against his left leg; that the fumes and gases discharged by the engine caused him to become sick, nauseated and dizzy; that about 11:20 A. M. he made complaint to his foreman who directed him to "stick it out until noon," stating that at noon the exhaust pipe would be attached; that shortly thereafter he "keeled over" and "didn't know a thing" until he "woke up about five o'clock in the evening" in Barnes Hospital. At the hospital a tentative diagnosis was made that respondent was suffering from carbon monoxide poisoning. He was at the hospital about four days, remained at home three or four days after leaving the hospital, and then returned to his work at defendant's plant, having been absent therefrom seven and one-half working days. He continued to work steadily without

taking any time off until June 30, 1925, when, as is alleged in the second count of the petition, he was incapacitated by carbon monoxide poisoning. During the interim between the time he returned to work the latter part of March and June 30th he made no complaint of continued illness, ill effects or impairment of bodily health or vigor resulting from the carbon monoxide poisoning he suffered on March 17th. Defendant's testimony is that upon and after returning to work respondent stated he "felt alright."

There is ample and sufficient evidence to establish negligence on the part of the appellant as charged in the first count of the petition and appellant makes no contention here to the contrary. At the close of all the evidence in the case appellant requested the court to instruct the jury to find for the defendant on the first count. The action of the court in refusing to give the peremptory instruction is assigned as error. Appellant's contention is that the evidence in this case considered in the light most favorable to plaintiff (respondent) did not make out a case of actionable fraud in the procurement of the release pleaded in bar of the cause of action laid in the first count, but established a valid release as a matter of law, and that the issue of whether the release was valid and binding upon plaintiff should not have been submitted to the jury.

Appellant introduced two written and printed instruments designated as "Defendant's Exhibit 2" and "Defendant's Exhibit 3," hereafter referred to as "Exhibits 2 and 3." "Exhibit 2," under date of April 14, 1925, in consideration of $56.25 paid to the releasor, releases and discharges "The Ganahl Lumber Company of and from all claims or demands, damages, actions, or causes of action in law or in equity from any matter, cause or thing whatsoever prior to the date hereof, and on account of personal injuries, and all other loss or damage resulting or to result from an accident to Wm. Brennecke which occurred on, or about, the 17th day of March 1925." This release is signed, "William G. Brennecke" with J. V. Nolan and H. C. Herberholt signing as witnesses. "Exhibit 3" is denominated a release-draft. The release is identical in date, language, form and content with "Exhibit 2" and signed and witnessed in the same manner. On the back of this release is a draft for $56.25 payable to the order of W. G. Brennecke "in settlement of liability claim of Wm. Brennecke against Ganahl Lumber Company." Alongside this draft is a space for endorsements, at the top of which this printed direction appears: "Endorsements. Release within must be executed and draft endorsed by payee." The first endorsement is that of "William G. Brennecke" followed by the notation, "signature O. K. J. B. Nolan." Other endorsements of banks through which the release-draft passed follow. Respondent admitted that he signed the release marked "Exhibit 2" and the duplicate

thereof marked "Exhibit 3" and that he endorsed the draft on the reverse side thereof and cashed it, but says his signature to each of these instruments was procured by fraud.

The testimony is that respondent had entered appellant's employment in February, 1925. For nine or ten years prior to that time he had been engaged in business with his brother-in-law, building automobile truck bodies. On April 14, 1925, following his return to work about the 26th of March, he signed the release. He testifies that on that date, "I was eating my lunch at noon and some young fellow out of the office came out there and told me to come inside, a man wanted to see me;" that he thereupon went to the office of the lumber company where he met a Mr. Nolan and that he had never seen Nolan before.

"Q. What did Nolan say to you when you came up there? A. He asked me if I was Mr. Brennecke. I said, 'Yes sir.' He said he was from the insurance company; that the Ganahl Lumber Company had all the employees—were insured for their wages; whatever time they lost they got their wages. And I said I don't know how many days I lost. He told me I don't know how many days.

"Q. Was it seven and one-half days? A. When he amounted it up, it was $56.25.

"Q. Did he say anything to you at that time with reference to the fact that he was representing the Ganahl Lumber Company or who did he tell you he represented? A. Just told me he represented the insurance company, that's all. He says, 'you know the Ganahl Lumber Company has all the men insured and whatever time you lose, you get your money for that.'

"Q. And he figured out your time and he said it was $56.25? A. Yes, sir. And that big paper he got me to sign was all fixed up when I came into the office.

"Q. Just tell the jury what took place and how you happened to sign your name on this paper marked 'Defendant's Exhibit 2?' A. When I came in the office that man had that paper lying on the desk and he gave me a chair. I was sitting this way and the desk was here and the paper on this side of me. I told the man I didn't have much schooling and didn't know anything about papers and he said I would have to sign it; furthermore I didn't have my glasses with me.

"Q. Couldn't you read without your glasses? A. No, sir.

"Q. Your spectacles? A. No, sir. I can see without my glasses, but I can't read without them.

"Q. And what did he say? A. I asked him to go get my glasses and he said 'well, you don't need to go away down there and get your glasses. I got this all fixed up. All you got to do is sign this paper.'

I signed that one and he gave me the other one and he says, 'Here's your money. Now you have to sign this one on both sides.'

"Q. Did he tell you it was a release or did he tell you it was a receipt? A. A receipt; he told me, 'that's just a receipt, that's all.'

"Q. Did you rely upon the representations made to you by this insurance claim agent? (Objections to the last question were made and overruled, to which exceptions were saved.) A. I thought the man was honest, I took his word for it. I didn't know what he was giving me or anything. . . .

"Q. Did this man say anything to you with reference to whether or not it was necessary for you to sign a 'paper before he could give you this draft? A. I don't remember anything."

The foregoing excerpts from respondent's testimony are quoted from the direct examination. On cross-examination he testified that at the time he signed the releases and endorsed the draft his glasses were "in the shop in a locker;" that he did not wear his glasses "all the time" and, "If I do something particular I put them on or if I read something I put them on;" that after he had signed the release in duplicate and endorsed the draft (signing his name three times) he folded the release-draft, put it in his pocket and took it home; that his wife could read, his stepson, Vogel, who was employed with him at the Ganahl Lumber Company, could read, and that his stepdaughter and her husband who lived in the same home with him and his wife, could read, but that he did not show them, nor either of them, the release and draft, nor tell them about it, and that some four or five days later he "cashed" it at a store at which he traded. The endorsements show that the release-draft was deposited for collection in the Citizens Bank of Maplewood nine days after it was signed and executed. Nolan, the claim adjuster for the liability insurance company carrying insurance covering appellant's liability for personal injuries sustained by its employees, testified that when an accident occurred at the plant it was reported to the insurance company; that report was made of the Brennecke accident of March 17th and the insurance company was later notified when Brennecke returned to work the latter part of March; that he thereupon made some investigation of the accident, and on April 14th called on Brennecke at the lumber company plant and discussed the matter with him at the office there; that he asked Brennecke how he felt, if he was able to do his work as well as formerly and if he "suffered 'any ill effects" from the accident, and that Brennecke stated he was alright; that thereupon he asked Brennecke what he wanted by way of settlement and Brennecke said he didn't know; that he made a proposition to pay Brennecke "full time for the time he was off" and "take care of his hospital bill, doctor's bill and medical expenses;" that Brennecke said that would be alright; that

he explained the release and informed Brennecke that it released the lumber company from "any further claims arising out of the injuries;" that Brennecke did not say anything about his glasses and Nolan denied that he told him that the insurance company carried insurance for the payment of employees' wages and that the release was merely a receipt for wages. The insurance company immediately paid the hospital charges and doctor's bill.

As we have mentioned, on June 30, 1925, following, Brennecke again became ill while working at the lumber company plant which he charged was caused by breathing carbon monoxide gas discharged from a combustion engine near the place he was working on that date. On September 17, 1925, he filed his original petition herein seeking damages for injuries alleged to have been sustained on June 30, 1925, but no mention was made of the injuries alleged to have been sustained on March 17th. On the 16th day of April, 1926, respondent filed his first amended petition based solely upon the injuries alleged to have been received on June 30, 1925. On the 5th day of April, 1928, he filed his second amended petition whereby in one count, he asked damages for injuries alleged to have been sustained on both March 17, 1925, and June 30, 1925. However, these two causes of action were separated and charged in separate counts in the third amended petition filed July 11, 1928, upon which petition the case was tried.

The respondent was not an illiterate man. He could read and write and the facts indicate that he was a man of at least ordinary and average intelligence. He was not sick, or distracted by pain or suffering or dependent or helpless nor was he in a necessitous situation. It was not claimed that, at the time he signed the release, he was suffering from any physical or mental disability which incapacitated him from entering into a valid contract or undertaking or comprehending the nature and effect thereof. He was apparently suffering no ill effects from the accident of March 17th and had been working steadily for approximately three weeks. He was *sui juris*, in full possession of his faculties, able to and had ample opportunity to read the instrument. Though he could not read without his glasses there was nothing to prevent him from procuring his glasses from the near-by locker, requiring at the most but a few minutes of time. Under such a situation the general rule is that the law will presume that he knew the contents of the instruments which he signed and cannot be heard to say that they did not express the real contract. [Dyrssen v. Union Electric Light & Power Co., 317 Mo. 221, 295 S. W. 116.] But the respondent says he is not amenable to the general rule as he was induced to sign the releases by false representations made by the agent of the liability insurance company, that the insurance company, which he repre-

sented, insured the wages of the lumber company employees, that respondent was entitled to wages for the time he had lost which the insurance company would pay and that the instruments he signed were merely receipts for wages.

In Ensler v. Mo. Pac. Ry. Co., 324 Mo. 530, 23 S. W. (2d) 1037, this court discussed a release which the defendant railroad company offered in bar of plaintiff's cause of action and which plaintiff charged was procured by fraud, and says:

"A person who is *sui juris* and who intentionally signs a paper is, in the absence of fraud or mistake, conclusively presumed to know its contents. [Crim v. Crim, 162 Mo. 544, 552, 63 S. W. 489.] Even in fraud cases the general rule is that where the means of knowledge are at hand and are equally available to both parties, and the subject-matter is alike open to their inspection, if one of them does not avail himself of those means and opportunities he will not be heard to say that he was deceived by the other party's misrepresentations. [Cottrill v. Krum, 100 Mo. 397, 403, 13 S. W. 753.] The courts will not protect those who, with full opportunity to do so, will not protect themselves. However, if one party is induced to forego the investigation that one would ordinarily make in the protection of his own interests, through false representations or other fraudulent devices on the part of the other, and the representations or devices so employed are of such character that they are reasonably calculated, under the attending circumstances, to and do deceive him and thereby cause him to act without making the investigation, his failure in that respect is excusable. [Citing cases.] . . . The fact that a false representation was made in respect to the paper is not necessarily sufficient to excuse plaintiff for affixing his signature thereto in ignorance of its contents, unless under all the circumstances, in view of his duty to give reasonable attention to the protection of his own interests, the false representation was reasonably calculated to, and did, induce him not to make the investigation which he would have otherwise made."

In view of respondent's duty, under all the circumstances, to give reasonable attention to the protection of his own interests, we do not think that the false representations which he says the claim agent made can be said to have been such as were reasonably calculated to induce him to forego inquiry and investigation and rely wholly and solely upon the statements of a man whom he did not know and had never seen before that day. We have in the preceding paragraph enumerated the facts of respondent's situation at the time, and here add that no confidential relationship existed between the respondent and the agent of the insurance company. The statements which respondent attributes to the insurance adjuster were such as would seem to have put respondent on guard had he "under the

circumstances'' given ''reasonable attention to the protection of his own interests.'' The reasoning and language of this court in Higgins v. American Car Company (Mo. Sup.), 22 S. W. (2d) 1043, fit the facts of this case touching the release in question. The plaintiff in the Higgins case was injured while working as a blacksmith in defendant's plant. He testified that when he was able to return to work someone in authority at defendant's office told him to go to the insurance company's office and ''they will settle your wages with you'' (for the time plaintiff had lost); that he then went to the office of the insurance company for the purpose of collecting his wages; that his wife went with him and she could read without glasses, but that he could not read without his glasses; that the agent of the insurance company asked him how long he had been laid off and he (the agent) figured it would come to about $130 and finally told plaintiff he would make it $140, which was about what his wages would amount to by the following Monday, and then said: ''Here is my check for signing this paper;'' that he (plaintiff) asked the agent what it was and the agent replied: ''It ain't nothing, only just a receipt, merely a receipt to show I paid your wages from the time you were injured.'' The plaintiff signed the instrument without reading it. It was a full release and discharge of all claims and demands by reason of the injury. Plaintiff said he did not and could not read the paper because he did not have his glasses. A check was handed him which he kept for three or four days and then his wife deposited it in a bank. As was said in the Higgins case it can be said in the instant case that plaintiff must have known the insurance company did not pay him his wages and that ''It was not his employer. Its only relation to the case was its liability as an insurer. He was not accustomed to signing a receipt when he got his monthly or biweekly wages from his employer. If it had been his custom, he would have said so. Ordinary prudence required him to ask the purpose of the receipt in such case. When he received his usual check for his wages, there is nothing to show there was any stipulation on the back of the check which he was to endorse. When he was paid his wages, there was no elaborate business transaction such as took place on this occasion . . . nor was the money from any one who owed him his wages. . . . He retained the check for three or four days, during which both he and his wife had ample opportunity to observe it and could reasonably see that it stated on its face that it was a release of his claim. He could see the statement on the back constituted a release of the claim.'' The Higgins case holds that the plaintiff was, as a matter of law, bound by the release which the defendant pleaded in bar of the cause of action. While in the Higgins case the plaintiff's wife was present at the time he signed the release and she could read without glasses but Higgins

did not have her read the paper to him, in this case Brennecke did not ask anyone to read the papers to him, his glasses were nearby and readily accessible, his stepson, an adult, upon whom he could rely was working in the same plant and he could easily have called upon him to read the paper for him and he retained the release with the draft on the reverse side thereof for at least four days during which time it is not denied he had ample opportunity to read it and acquaint himself with its provisions and learn its contents.

Assuming that respondent gave reasonable attention under the circumstances to the protection of his own interests then he must have known and comprehended the nature of the instruments he signed. He cannot therefore be heard to say that he was induced to forego any and all inquiry and close his eyes to that which by the exercise of any degree of attention he must have discovered and known. The testimony shows that the instruments which respondent signed were spread out before him on the desk at which he was seated. They were not folded, covered up or concealed in any manner. Photostatic copies of Exhibits 2 and 3 appear in the printed record filed here and printed at the top of each in heavy, black, capital letters, much larger in size than the type in which the body of the instrument is printed, the word ''RELEASE'' stands out. It is larger than respondent's signature which without using glasses he admits he inscribed in three places on the instruments in clear, legible, even writing, exactly upon the line appointed therefor which challenges attention since respondent says that without his glasses he could not see to read the instruments to which he admittedly affixed these signatures. The full and complete release which he signed with the draft on the reverse side thereof was retained by respondent in his possession, as he admits, for at least four days before he cashed the draft and received the money thereon. It is not claimed, that any fraud was practiced or operated upon him during this period to induce him to refrain from reading the instrument or which prevented him from informing himself as to the contents thereof. Assuming that he did that which he should have done under the attendant circumstances and gave reasonable attention, as he had ample opportunity to do, to the release and draft in his sole possession and control he must have discovered the true nature of the instrument whereupon he should then have repudiated the release and draft and refused to act thereon, but instead of so doing he proceeded to cash it and obtain the sum of money therein named and which was the consideration stated in the release when he knew or by the exercise of any reasonable degree of attention could have known the contents and the clearly and plainly expressed purpose and meaning of the instrument. We think the evidence is insufficient (see Higgins v. Am. Car Co., supra) to establish ac-

tionable fraud and thereby avoid and invalidate the release which appellant pleaded in bar of the first count. The court should have granted defendant's request for a peremptory instruction on the first count of the petition and erred in not doing so; therefore the judgment of the trial court on the first count is reversed.

The evidence on behalf of respondent in support of the cause of action stated in the second count based upon an injury alleged to have been sustained on June 30, 1925, is that on that date he was working with a helper at a bandsaw located in that part of appellant's plant known as the "old mill." The building was one story in height, there were no partitions, the various machines in use there being located in the one large room which was 160 feet in length, north-and-south, forty feet in width, east-and-west, with ceiling twenty feet in height. A balcony twelve feet in width and nine feet above the floor extended across the north end of the room. There were a number of large windows along the west side of the room, only one however was open. A door fourteen and one-half feet wide and twelve feet high on the east side was open. The bandsaw at which plaintiff was working was situate near the northwest corner of the room under the balcony and about eight feet from the west wall. A crosscut saw and a gasoline engine by which it was operated stood eight or nine feet southeast of the bandsaw. The gasoline engine was not equipped with pipes to carry the exhaust outside the building. The exhaust was toward the west. This crosscut saw was not used regularly, being an emergency saw, and respondent testified that "sometimes it would run a day or two in succession and then some days it would only run for half an hour or maybe an hour or two hours." Respondent had been working at the bandsaw with a helper for three weeks. On June 30th, he and his helper were engaged at the bandsaw in cutting wooden discs. The materials which he was using and the finished pieces were stacked about six feet high around the bandsaw, creating what respondent terms "a pocket." The crosscut saw was in operation with three men working about it. Brennecke testified that about 1:30 P. M., he became sick, nauseated and dizzy, went outside, sat on a lumber pile, became very weak and could not stand. His stepson, Vogel, was called. Brennecke's condition became worse and about four o'clock Vogel took him in an automobile to a physician, Dr. Frye, and then home. The left side of his face was drawn, his face had a "greenish" color, he "mumbled" in an incoherent manner, was confined to his bed, didn't talk much for three or four days and only in a disconnected manner, suffered headaches and dizziness and didn't seem to fully realize his surroundings. He was in bed most of the time for two weeks and was treated by Dr. Frye. His mental condition improved some,

but he continued to be dizzy and suffered severe headaches, his hearing seemed to be impaired and he was very weak. He then went to Barnes Hospital and there was advised to consult Dr. Eyermann. He went to Dr. Eyermann on July 15, 1925, and continued to visit his office weekly for treatment until December 9, 1925. Dr. Eyermann was called as a witness by appellant and testified that in his opinion Brennecke's condition resulted from arteriosclerosis (commonly known as hardening of the arteries) and that his treatment of the patient was upon that diagnosis; that during the period he was treating him, Brennecke's complaint "consisted mostly of dizziness, black specks before his eyes and weakness and that sometimes he was nauseated;" that he discovered no mental deterioration when he first examined him on July 15, 1925, nor was any mental impairment or disturbance noticeable during the period of treatment until December 9, 1925, "when there seemed to be a considerable emotional psychic upset for some reason which was not exactly clear." On January 20, 1926, Dr. Eyermann went with Brennecke to Dr. Deppe, a neurologist, who made an examination and made numerous tests. Both Dr. Deppe and Dr. Eyermann testified that at the time, Brennecke was "demented." Respondent called Dr. Deppe as a witness and he testified that in the course of the examination Brennecke answered questions incorrectly and that the tests to which he was subjected revealed that he was then of unsound mind. The examination further revealed that Brennecke was totally deaf in the left ear and that his hearing in the right ear was impaired. Expert medical witnesses on behalf of respondent, in response to hypothetical questions expressed the opinion that Brennecke's condition was caused by carbon monoxide poisoning, as charged in the second count, and that the exposure to carbon monoxide gas, as shown by the evidence concerning the immediate effect upon him, was of sufficient intensity and degree to cause hemorrhages in the brain, punctuate hemorrhages, resulting in the formation of scar tissue in the brain; that the exposure could have caused hemorrhages in the eighth cranial nerve, which might result in deafness or impairment of the hearing, and that such exposure might seriously affect the nervous system, resulting in recurring headaches, dizziness, vertigo, loss of memory and at times mental disturbances and impairment. In May, 1926, there being no apparent improvement in his mental condition and general health, Mrs. Brennecke took respondent to the State of California. She testifies that he was sullen, moody, talked in a disconnected way, was unclean in his person and manifested other traits marking a complete change in personality. Some improvement was noted and in October, 1926, they returned to St. Louis, and he was then taken to a farm to which his stepson had moved. He continued to improve, though he was

unable to work. He testifies that during this period he suffered from headaches and dizziness almost daily, which condition had continued to the date of the trial. In November, 1927, he returned to Dr. Deppe for another examination. Dr. Deppe testifies that he could not recognize him as the same man he had examined on January 20, 1926; that the change was "most remarkable from both a personal and mental standpoint;" that Brennecke carried on an intelligent conversation; that he stated he could not remember or recall anything that had transpired after the time he was injured on June 30, 1925, until about July 19, 1927; that from this examination he found respondent's general physical condition to be good; that the deafness in the left ear and impaired hearing in the right ear still existed; that the only other complaint respondent made was of dizziness and headaches; that the mental tests were satisfactory; that he found the reflexes, coordination, sensation and speech all normal and that there was no muscular weakness or paralysis. Dr. Woolfort, one of respondent's expert witnesses, who examined Brennecke three days before the trial, which was begun on October 24, 1928, testified that the blood vessels were in splendid condition and there was no hardening of the arteries; that the heart, lungs, abdominal organs and kidneys were normal; that the reflexes, however, indicated "a pathological change in the brain and spinal cord" and gave it as his opinion that the nervous system was permanently affected and that respondent would continue to suffer from severe headaches and dizziness. The same opinion as to permanent damage to the nervous system was expressed by other medical experts. It is not claimed by respondent that he was laboring under any mental impairment at the time of the trial and his testimony is clear, coherent and in detail indicating no lack of intelligence, comprehension or memory, except he testified that he did not have any clear memory of events occurring between June 30, 1925, and July, 1927. Respondent's evidence was that he had worked regularly, had been in good health, had never suffered from headache or dizziness or any other physical ailments and that his hearing was good, prior to the injury, and that he had not been able to work since that time and had not earned anything. We shall not undertake any detail statement of appellant's evidence tending to show that respondent was not in fact exposed to carbon monoxide gas on June 30, 1925; that the gasoline engine complained of was not in operation on that date; the opinion of medical experts that, as the facts were related by respondent and respondent's witnesses, the exposure was not and could not have been of sufficient intensity and degree to cause any permanent injury and appellant's contention that respondent's illness was caused by and the result of arteriosclerosis antedating the accident. These were questions for the jury which were resolved against appellant by the

verdict. In refutation of appellant's theory that respondent was suffering from arteriosclerosis respondent points to the testimony of Dr. Deppe who stated that if the demented condition under which respondent labored for a considerable period of time had been caused by hardening of the arteries the very remarkable and complete mental recovery could not have occurred, as senile dementia is progressive and having once started a return to normal mental health cannot be effected.

The evidence was sufficient to take the case to the jury on the second count and appellant does not contend that the trial court erred in overruling its demurrer to the evidence on that count. Appellant's sole argument here, as to the second count, is that the verdict and judgment for $15,000 on that count is excessive. Prior to the injury respondent was in good health, regularly employed and worked steadily. At the time of the injury he was earning a wage of $7.50 per day. His foreman testified that he was a capable and efficient worker. Because of the injury and thereafter to the time of the trial he was unable to do work of any kind and his earning capacity and means of livelihood were destroyed. At the wage he received, in the three years and four months which passed between the date of the injury and the trial of this case, he could have earned approximately $7,700, and the suffering and pain endured and expense of medical treatment must be considered. The testimony is that at the time of the trial he still suffered from dizzy spells and headaches which were so frequent and of such duration and intensity as to incapacitate him for doing any regular work and he was totally deaf in the left ear with hearing impaired in the right ear. These injuries, the medical experts testified, were, in their opinion, permanent. Testimony concerning "brain involvement and involvement of the spinal cord" and permanent injuries to the general nervous system tended to show that respondent's injuries were of a serious nature. Under the evidence the jury were warranted in finding that respondent's condition resulted from the injury made the basis of the cause of action stated in the second count. "There is no established rule by which the loss sustained by such injuries may be accurately measured. The assessment of damages was within the peculiar province of the jury." [Porter v. Chicago B. & Q. R. Co. (Mo. Sup.), 28 S. W. (2d) 1035.] This is not a case of visible injury, as the loss of a leg or arm, which might be said to furnish some approximate basis upon which damages can be estimated. Upon a verdict for plaintiff the evidence must be viewed in the light most favorable to plaintiff and applying this rule to the evidence we do not think the verdict should be declared excessive in view of the loss of earnings and earning power, the continued pain and suffering to which respondent has been and will in the future be sub-

jected, the impairment of his hearing and injury to the brain and general nervous system.

Therefore the judgment of the trial court on the second count is affirmed. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.