PEARL BRESLER, v. KANSAS CITY PUBLIC SERVICE COMPANY—186 S. W. (2d) 524.

Kansas City Court of Appeals. January 22, 1945.

*Charles L. Carr* and *Cooper, Neel & Sutherland,* for appellant.

*White & Hall* for respondent.

BLAND, P. J.,—This is an action for damages for personal injuries. There was a verdict in favor of defendant. The court granted plaintiff a new trial on the ground that it erred in the giving defendant's instruction No. 3. Defendants has appealed.

The facts show that plaintiff was injured about 8:30 A. M. on November 11, 1941, as the result of a collision between an automobile, in which she was riding, and one of defendant's street cars. Plaintiff and her husband, who was driving the automobile, and their twin daughters, 7 years of age, were proceeding eastwardly on Morningside Drive, a public street in Kansas City. Plaintiff was seated on the front seat to the right of her husband and her twin daughters were on the rear seat. They had turned off of Brookside Boulevard and proceeded east on Morningside Drive, traveling at a rate of speed of about 15 miles per hour. Defendant's double track car lines run north and south on a private right of way and intersect Morningside Drive at approximately right angles. It is approximately 125 to 150 feet from Brookside Boulevard to the double set of tracks, which tracks are about 8 feet apart. Sixty-first Street is the first street crossing the tracks south of Morningside Drive. Sixty-first Street is 823.21 feet distant from Morningside Drive. The evidence on behalf of plaintiff shows that the automobile stopped at the stop sign approximately 7 feet west of the first rail of the street car tracks.

Plaintiff's husband looked to the south when the car stopped but, on account of some shrubbery present, he could see a distance of only 500 feet. He saw no street car.

Plaintiff testified that about the time the automobile started up from the stop sign she looked to the south and saw the street car coming; that it had "just crossed 61st Street". Plaintiff's husband put the automobile in low gear and started from the stop sign to cross the tracks at a rate of speed of about 5 miles per hour. Plaintiff noticed the street car the second time as the automobile came on the tracks. At this time she did not judge the distance. As the automobile went over the small rise at the first set of tracks the motor started to sputter and continued to sputter. It went across all of the tracks except the last rail. The front end was across the tracks and the rear wheels were between the northbound tracks when the motor went dead and the automobile stalled.

The next time plaintiff observed the street car was when the automobile had come to a complete stop. At this time the street car was 450 feet from the automobile. When the automobile stalled plaintiff's husband tried to start it 3, 4 or 5 times. Plaintiff next saw the street car when it was 225 feet from the automobile. She happened to look up as the motorman was making quite a lot of racket ringing his bell and waving his arms for the automobile to get off the track. Plaintiff's husband first saw the street car when it was 250 or 300 feet up the track. The street car was traveling at a rate of speed of about 25 miles per hour. The motorman started to ring his bell when he was 175 or 200 feet away. He kept sounding his bell. Plaintiff turned her head and shoulders to the left when the street car was 225 feet south of the automobile, as her children had started crying. She did not see the street car again and did not see it slow down. When plaintiff's husband looked up again the street car was 45 to 50 feet away. The gong was sounding and the street car kept coming. The front of the street car hit the rear wheel of the automobile shoving it around 25 feet. The street car traveled 45 feet after the collision.

Plaintiff's evidence tends to show that the street car could have been stopped in an emergency, including reaction time, and proceeding at a rate of speed of 4 or 5 miles per hour in 5 to 8 feet, at 12 to 13 miles per hour it could have been stopped in 15 or 20 feet, at 18 to 19 miles per hour, within 30 to 35 feet, at 25 miles per hour within 45 to 50 feet, at 30 miles per hour within 60 to 65 feet.

Defendant's evidence tends to show that the street car was traveling at a speed of 20 to 25 or 26 miles per hour; that the operator of the street car saw the automobile west of the stop sign, moving at a rate of speed of 8 to 12 or 10 miles per hour; that the automobile did not stop at the stop sign; that the operator sounded his bell when he saw the automobile approaching the tracks; that he continued to

sound it but the automobile continued on; that when the automobile was 45 , 50 or 60 feet west of the track the street car was probably 100 feet back proceeding at a rate of speed of 18 to 20 miles per hour; that the automobile came to a sudden stop with the rear wheels on the northbound street car tracks when the street car was 80, 90 or 100 feet away; that when the automobile stopped the operator threw the street car into emergency and rang his bell; that at this time a passenger looked and saw the automobile stalled on the track 50 feet ahead; that the automobile appeared to be attempting to cross in front of the street car and came to a stop on the tracks immediately in front thereof; that the operator applied the brakes hard when the street car was 25 or 30 feet away from the automobile, possibly the length of the street car, or 38 or 40 feet; that the driver of the automobile was trying to shift gears or was trying to start the automobile to get off of the track; that when the automobile stopped the street car was probably 25 or 30 feet or possibly a street car length away; that the brakes were applied at that time and the wheels of the car slid on the rails; that it all happened in just an instant; that the brakes were applied before the street car reached the intersection; that the street car traveled its length after the brakes were applied before the collision; that after the operator put the car in emergency and the car was 20 or 30 feet from the automobile the operator motioned to the driver of the automobile to get it off the tracks; that the front end of the street car was 45 or 50 feet away when the front of the automobile reached the west rail of the northbound track, the street car having been in emergency for about 25 or 30 feet; that the street car went 12, 15 or 17 feet after the collision and stopped with the front end about at or 3 feet north of the slab or the north edge of Morningside Drive; that the street car could have been stopped, including reaction time, in an emergency, going at the rate of 25 or 26 miles per hour within 140 or 150 feet; that going at the rate of 18 to 19 miles per hour, within 115 to 116 feet; that going at 12 to 14 miles per hour, it could be stopped within 103 or 104 feet; that proceeding at the rate of 4 or 5 miles per hour it could be stopped within 25 or 30 feet; that the car was 43 feet 10 inches in length; that it weighed approximately 19½ tons; that a street car going at 25 miles per hour travels 35 or 40 feet in one second reaction time and that the automobile going at 10 or 12 miles per hour, up-grade, could have been stopped almost instantly in 2 or 3 feet.

Plaintiff submitted the case to the jury, solely, under the humanitarian doctrine. Her instruction told the jury that if they found that plaintiff was an occupant of the automobile as it approached defendant's car line; that the automobile stopped or stalled on the east or northbound set of street car tracks, and "If you further believe and find from the evidence that while said automobile moved onto and was upon the northbound or east of said street car tracks, if so,

plaintiff was seated therein, was in a position of imminent peril and danger from the approach of defendant's oncoming northbound street car, if so, and if you further believe and find from the evidence that defendant's said motorman operating said street car, saw or by the exercise of ordinary care, could have seen plaintiff and the automobile in which plaintiff was seated in such position of imminent peril and danger, if you so find, in time thereafter by the exercise of ordinary care on the part of said motorman and with the use of the means and appliances at hand and with safety to himself and the other persons on said street car, to have stopped said street car'', etc.

The court granted a new trial on account of giving, on behalf of defendant of its instruction No. 3 reading as follows:

''The court instructs the jury that the term, 'imminent peril' does not mean remote, uncertain, contingent danger nor, so far as the plaintiff is concerned, avoidable danger, but means danger that is immediately impending and that admits of no time for deliberation on the part of the person in peril between its appearance and the impending calamity''.

Defendant insists that there was no error in the giving of its instruction and that the court erred in sustaining plaintiff's motion for a new trial. In this connection defendant says that ''all parts and elements of the above definition of imminent peril, as submitted in defendant's instruction No. 3 are approved and recognized as proper by . . . Missouri cases.'' Defendant then cites a number of cases where various parts of said instruction are set forth in connection with discussions as to the meaning of imminent peril. Defendant's instruction is not set forth in any one of these cases, but defendant is correct in saying that viewing all of the cases together, the definition of imminent peril set forth in its instruction is proper from a legal standpoint.

However, in order to understand the meaning to be given to the various phrases contained in the definition in defendant's instruction, it is necessary to have some general understanding of the humanitarian doctrine from a legal standpoint and, in this connection, a study should be made of the facts and circumstances appearing in the various cases in which the language in question appears. In none of the cases cited did the court state, in connection with the language used, that it would be proper to incorporate the same in an instruction to laymen who presumably have no understanding of the humanitarian doctrine, except as explained to them by the trial court. In none of the cases cited was the appellate court attempting to formulate an instruction similar to this one that might be submitted to a jury, defining imminent peril. The nearest case to this one that defendant cites on the point is Byrnes v. Poplar Bluff Printing Co., 74 S. W. (2nd) 20. In that case there was a verdict for the plaintiff. The Supreme Court found that plaintiff's main instruction was an erron-

eous one and it was considering (l. c. 27) whether a refused instruction offered by the defendant should have been given by the trial court. The instruction which the court refused defined imminent peril in substantially the same language as that used by the defendant in the case at bar, with the exception that the words, "so far as plaintiff is concerned", did not appear therein.

The court said, l. c. 27: "This part of the instruction told the jury that imminent peril did not mean avoidable danger. That might be true so far as plaintiff was concerned; but to tell the jury that imminent peril did not mean avoidable danger, without explanation, qualification, or application, was calculated to cause a jury of laymen to believe that imminent peril could not be avoided by either plaintiff or defendant. While the instruction is susceptible of the construction that imminent peril meant peril which the plaintiff could not or would not avoid, it is also subject to the construction that the words imminent peril, as used in the instruction, meant peril which neither plaintiff nor defendant could avoid. For that reason no error was committed in refusing the instruction."

It appears that the court found the instruction to be erroneous for a certain definite reason, which certainly was a good one; but it did not hold that the instruction would have been a proper one even if the words that were omitted had been included. Having found that part of the instruction under consideration erroneous for one reason, it was unnecessary to go into any other reasons, even if urged against that part of the instruction, and there is nothing in the opinion to indicate that any other ground of attack was made upon it. There is no duty upon an appellate court to formulate a proper instruction for the losing party in the trial court even though it would appear that there will be another trial of the case. In addition to this, the case involved a collision between two automobiles, the facts being entirely different from those in the present case. We find that this case is no aid to the defendant.

We think that defendant's instruction was clearly erroneous. Reading plaintiff's instruction, together with defendant's instruction, the jury is told, in effect that (under plaintiff's instruction) the motorman was not called upon to do anything to avert the collision until he could have seen plaintiff in a position of imminent peril and danger; but (under defendant's instruction) if plaintiff could have avoided the danger she was not in imminent peril. This could not have been anything but confusing and misleading to the jury: It would appear that the only thing plaintiff could have done to avoid her injury was to alight from the automobile; but to tell, or to intimate, to the jury that plaintiff could not recover if she had an opportunity to alight from the automobile was clearly improper. [Hunter v. Fleming, 7 S. W. (2nd) 749; Tuck v. Ry. Co., 268 S. W. 682, 683.] The instruction injects the question of contributory negligence, which is

no defense in a humanitarian case. [Pennington v. Weis, 184 S. W. (2d) 416; Brown et al. v. Wheelock et al., 83 S. W. (2d) 911; Borgstede v. Waldbauer, 337 Mo. 1205; Millhouser v. K. C. Public Serv. Co., 55 S. W. (2d) 673; Cooper v. K. C. Public Serv. Co., 116 S. W. (2d) 212.]

The instruction is not only harmful in using the words "in so far as plaintiff is concerned", but the error was made more pronounced when the court told the jury in the instruction that imminent peril means danger that "admits of no time for deliberation on the part of the person in peril between its appearance and the impending calamity".

The law attempted to be stated in defendant's intruction first appears in the concurring opinion of Judge White in Banks v. Morris & Co., 257 S. W. 482, 486, where it is said: "I think also that the appellant in this case has failed to appreciate the significance of the expression 'imminent peril'. That does not mean remote, uncertain, contingent, nor (for the person affected) avoidable danger. It is imminent, immediately impending; it admits of no time for deliberation on the part of the person in peril between its appearance and the impending calamity". This statement of Judge White has been many times quoted with approval by our appellate courts but, as before stated, it has never been held by any court that this language is proper to be submitted to a jury in an instruction. That the language that we have last quoted is technical, and not likely to be understood by laymen, is shown by what immediately follows in Judge White's opinion. After the above quotation from his opinion, he said, in this connection: "A person in full possession of his faculties, standing on a railroad track with a train approaching 200 yards away and due to arrive in 10 seconds would not *appear* in imminent peril, because, in the natural course of things, such person would be expected to step off before he could be injured. *The peril would be imminent only when the ordinary and natural effort to be expected in such a person would not put him in place of safety.*" (Italics ours.) What Judge White was saying in the use of the words "it admits of no time for deliberation" was that the danger admits of no time for *effective* deliberation; that is, time for deliberation and action on the part of the person in peril. In addition, Judge White was speaking primarily of the question of *"reasonable appearances" to the operator of the vehicle causing the injury* as related to imminent peril. As was said in Robards v. K. C. Public Service Co., 177 S. W. (2d) 709, 712: "There are two elements involved in a humanitarian case where plaintiff is not oblivious to his peril (as here). (1) Plaintiff must prove facts and circumstances tending to show his inextricability, and (2) that the operator of the vehicle had notice of his situation in order to bring home knowledge to the latter of such fact. [Banks v. Morris & Co., 302 Mo. 254, 257 S. W. 482.] It is in connection

with the second condition that 'reasonable appearances' has to do''. Cases can be imagined where a person is in peril and oblivious thereof or inextricable peril and the operator of the vehicle, causing the injury, not be charged with knowledge thereof by the use of the required degree of care on his part, on account of the peculiar facts present. These considerations all show that there are technical aspects of the humanitarian rule. What would a jury understand by an instruction telling them that the danger must "admit(s) of no time for deliberation on the part of the person in peril between its appearance and the impending calamity''? The jury might guess that the meaning of the word "deliberation" is to be taken in the sense in which Judge White applied it in Banks v. Morris & Co., but more than likely would be confused as to its meaning and might conclude that, if plaintiff had time to deliberate between the time of the appearance of the danger and the impending calamity, she could not rcover. The jury might conclude that the word "deliberation" included an opportunity to escape injury, but was left to speculate upon what plaintiff should have done to have averted it. Such an issue was not in the case. It is error for the court to give a confusing and ambiguous instruction to a jury. [Belt v. Goode, 31 Mo. 128.] It has often been pointed out the danger in taking language from an opinon or opinions of the appellate courts and incorporating it in an instruction to a jury. There are many things said in opinions which would be improper if contained in an instruction to a jury. [64 C. J. pp. 633, 665. See, also, Plank v. R. J. Brown Pwt. Co., 61 S. W. (2d) 328, 332; Wolf v. Mallinckrodt Chem. Co., 81 S. W. (2d) 323; Knapp v. Hanley, 153 Mo. App. 169, 180.] In addition, statements in opinions may not always be applicable to cases involving different facts. [See Morris, et al. v. Consolidated Underwriters, 163 S. W. (2d) 586, 587.]

However, it is claimed by the defendant that plaintiff's theory at the trial was that she was in inescapable and unavoidable danger and could not have avoided the collision; that, therefore, defendant's instruction follows plaintiff's theory and did not constitute prejudicial error. Whatever was plaintiff's theory, under plaintiff's evidence the jury might have come to the conclusion that she had time to alight from the automobile after it came to a stop and thus avoided her injury and, under defendant's instruction, the jury was invited, in effect, to consider this as an element in the case and, in effect, was told to find against the plaintiff if she could have done so.

It is claimed that defendant's instruction, when read in connection with plaintiff's instruction, is not erroneous, and that plaintiff's instruction was more favorable to her than she was entitled; that, under the facts in this connection, the duty of the street car operator only commenced when the automobile stalled on the tracks and the plaintiff was in inescapable peril; that plaintiff's instruction broadens the question of imminent peril "even to the time that the

automobile had started from the stop sign''. We think that the defendant is in error in stating that the instruction allowed the jury to find that plaintiff was in a position of imminent peril from the time the automobile started from the stop sign and before it got upon the track. The instruction says ''while said automobile *moved onto and was* upon the northbound or east (track) of said street car tracks''. Moving on to the track is certainly not approaching the track. It evidently was the intention of the person drawing the instruction to permit the jury to find that plaintiff was in a position of imminent peril, not only after the automobile became stalled upon the track, but when the automobile, or a part thereof, was upon the track and before it stopped.

There was evidence tending to show that plaintiff was in such a position of peril at the latter time. Plaintiff's husband testified: ''I started over these tracks. It is just a small rise over the first set of tracks, and the car started—the motor started to splutter, and it wasn't getting enough gas, and it dragged along there and I choked it to try to *start it* and it just spluttered along there, and I got across all the tracks except the last rail''.

Defendant's witness, Walton, who was upon the street car, testified that the automobile stopped with the front wheels between the rails of the southbound tracks and started up again. ''Q. How fast did it go after it started up again, did it get up to five or ten miles an hour? A. Well, no, I wouldn't judge that from driving my own car when it is *jerking around that way*. I would judge it would be nearer around three or four miles an hour. Q. So from the time it stopped with the front wheels there on the southbound rails it went three or four miles an hour until it moved up to where it finally stopped? A. Well, that is *a jerking motion there*. Q. Yes, I understand that. A. Of course, my judgment isn't very good on speed when the car is *just jerking along*. Q. Well, of course you are just estimating the distances here as well as the speeds. A. Yes. Q. So you would say about three or four miles an hour? A. I wouldn't put it at four, I would say nearer two or three. Q. Between two and three miles an hour? A. Yes. Q. Where was his car when he finally stopped? A. Well, the car stop is about the center, or if it is any difference at all it is north of the center in here (indicating), and when the car stopped with the rear part of it along about on that farthest east track, that is the wheels would be on that, I would judge. Q. So it traveled over here where it *first stopped* over across these rails so that it had traveled about—A. (interrupting) *In a jerking motion, a jerking movement*. Q. Yes, I understand, it had traveled about two car lengths, hadn't it? A. Well—Q. Approximately? A. Approximately, maybe three''.

From all of the testimony the jury could have inferred that the motorman saw that the automobile was in trouble as it moved onto

the tracks in question and that this trouble continued up to the point of the collision, and that plaintiff was in peril, seated in the automobile, even though, were it not for the trouble the driver was having with it, the automobile would have had time to clear all of the tracks before the street car reached the path of the former.

In addition to this, no case is cited by the defendant holding that, generally, defendant is warranted in securing an unfavorable instruction to plaintiff because he or she has procured one more favorable than the latter is entitled. The case of Dove, et al. v. Atchison, T. & S. F. Ry. Co., 163 S. W. (2d) 548, is no aid to the defendant. The instruction there involved defined contributory negligence. It was general in its wording and plaintiff claimed that it broadened the issues and gave the jury a roving commission to find plaintiff guilty of contributory negligence from any cause. The instruction did not confine the general statement therein contained to the particular facts in the case. The court commented upon an instruction given on behalf of the plaintiff directed to a certain phase of contributory negligence in connection with some of the facts developed at the trial of the case. It stated that plaintiff's instruction was more favorable to him than he was entitled and, from a consideration of the whole case, the court held that defendant's instruction was not erroneous. It will thus be seen that the Dove case and the case at bar are not at all similar. Even if plaintiff's instruction were more favorable to her than she was entitled, and we have held that it is not, defendant's instruction, in this connection, is unlike the instruction in the Dove case. Standing alone the instruction in the present case was ambiguous and misleading to the jury and did not constitute a proper difinition of the term "imminent peril", so far as the jury was concerned, under the facts of this case. It has been held that the term "imminent peril" consists of ordinary English words, which do not require a definition. [Perkins v. Term. R. Ass'n. of St. Louis, 102 S. W. (2d) 915, 921; Bryant v. Kansas City Rys. Co., 228 S. W. 472, 474.] If this is true, it would appear that the term needs no definition at least in an ordinary case. However, if the term is defined it should not be done erroneously, as in this case. Defendant says that if its instruction was erroneous it was the duty of the plaintiff to offer a clarifying instruction, but there is no duty upon a party to correct a misleading instruction of his opponent. [Continental Gas Co. v. Monarch Trans. & Stor. Co., 23 S. W. (2d) 209; Weishaar v. Kansas City Publ. Serv. Co., 128 S. W. (2d) 332, 343.]

The judgment is affirmed. *Dew, J.*, concurs; *Cave, J.*, concurs in the result.