Alfred Eugene FAUGHT, by next friend George Faught, Plaintiff-Respondent,

v.

William Warner WASHAM, Defendant-Appellant.

No. 47064.

Supreme Court of Missouri,

Division No. 2.

Sept. 14, 1959.

Motion for Rehearing or to Transfer to Court en Banc or to Modify and Clarify Opinion Denied Dec. 14, 1959.

L. F. Cottey, Lancaster, Chapman & Chapman, Chillicothe, for appellant.

M. E. Montgomery, Milan, Edwards, Hess & Collins, Macon, for respondent.

James E. Reeves, Caruthersville, amici curiæ.

Walter A. Raymond, Kansas City, amici curiæ.

A. P. STONE, Jr., Special Judge.

This is the second appeal in a damage suit for personal injuries alleged to have been sustained in a vehicular accident about 1:45 A.M. on October 15, 1953, at the East Fork bridge on U. S. Highway 36 about 2.7 miles west of Macon, Missouri. The first trial resulted in a jury verdict for defendant; but, upon appeal, the judgment was reversed and the cause was remanded because of an erroneous instruction. Faught v. Washam, 365 Mo. 1021, 291 S.W.2d 78. Upon retrial, another jury found for plaintiff and assessed his damages at $20,000. Defendant appeals.

The East Fork bridge, 365 feet in length, had side railings of two-inch iron pipe; and, from the east end of the bridge, guard

rails 40 feet in length angled onto the shoulders of the highway. The roadway on Highway 36 and the bridge floor were of concrete and 20 feet in width. East of the bridge, the highway was perfectly straight to the top of a hill some 1,800 feet distant; and, for about 350 feet east of the east end of the bridge, the highway was practically level. The accident occurred on a dark, clear night when the pavement was dry.

Plaintiff, then 20 years of age and alone at the time, was driving his 1941 Mercury sedan, olive drab in color with whitewall tires, in a westerly direction on Highway 36 at a speed of 60 to 65 miles per hour. As he approached the bridge, he "dozed off to sleep" and his automobile veered to his left-hand or south side of the roadway, first shearing off the guardrail and then tearing down 105 feet of the south bridge railing before coming to a stop on the bridge, crosswise of the highway, with the rear end of the Mercury about one foot from the north bridge railing and with the front end four or five feet from the south bridge railing. The account of plaintiff (the sole witness on this subject), curiously but convincingly credible to the jury, was that this violent encounter with the guardrail and bridge railing damaged his Mercury only to the extent of having "blowed out" its left front tire, "mangled up" its left front fender, and "knocked out" its lights, and left plaintiff in the driver's seat physically unscathed and mentally alert. Continuing, plaintiff testified that, "just seconds" after the Mercury came to a stop on the bridge, he observed the headlights of an approaching west-bound automobile (subsequently identified as defendant's 1953 Buick Roadmaster sedan), then about 600 to 700 feet east of the bridge. As plaintiff was getting out of his unlighted Mercury, with his left hand on the left front door (then open), his right hand on the steering wheel, his left foot on the left running board, and his right foot "by the accelerator," the right rear portion of defendant's west-bound Buick struck the

left front portion of the standing Mercury with the result (so plaintiff said) that "the front fender came through the bottom and caught my (right) foot, brought it back under the seat," pinning plaintiff in his automobile until, seeing "the dashboard all tore out and * * what I thought was smoke * * *, I reached down and pulled my foot from behind that seat."

Riding with defendant, returning from St. Louis to his home in Marceline, Missouri, were his wife, her mother, and two other ladies, one of whom was killed in this accident. Defendant's version of the accident was that, when his west-bound Buick Roadmaster, then traveling 60 to 70 miles per hour with the headlights on "bright," reached a point between 100 and 130 feet from the east end of the bridge, "I saw something that gave me the impression of being a piece of paper, something white in my lane," which "I couldn't identify * completely"; that, "just a second after that," when "possibly 70 or 80 feet" from the east end of the bridge and traveling 60 to 65 miles per hour, he observed plaintiff's unlighted Mercury on the bridge, immediately applied the power brakes on the Buick, and swerved to his left or to the south; and that, "bouncing" on the loose pipe and debris scattered over the bridge floor by the Mercury, defendant lost control of his Buick, its left front wheel struck the low concrete curb along the south side of the bridge floor, the right doors of the Buick "flew open," three of the four passengers in the Buick were thrown onto the bridge floor, and the Buick went off the south side of the bridge and came to rest on its left side, headed west, on the ground about 8 feet below the bridge floor.

Plaintiff's theory, apparently accepted by the jury, was that, when the left front wheel of defendant's west-bound Buick struck the concrete curb on the south side of the bridge floor, the Buick was whirled in a counter-clockwise direction and its right rear portion was thrown violently into the left front portion of plaintiff's

Mercury, causing the major portion of the damage to the Mercury and all of plaintiff's injuries. Although defendant and his surviving passengers testified (as defendant put it) that "to the best of my knowledge at this time I would say" that the Buick went off the bridge before it reached plaintiff's Mercury and that there was no collision between the two vehicles, defendant's counsel frankly concede that the jury verdict "has resolved any dispute as to whether the two cars collided."

Defendant's initial complaint on this appeal, i. e., that the trial court erred in overruling his motion to dismiss plaintiff's petition, requires a brief review of the pleadings. Following remand of the case, to-wit, on November 15, 1957, defendant filed, for the first time, a counterclaim alleging primary negligence·on the part of plaintiff and seeking the aggregate sum of $12,857 for personal injuries and property damage. To that counterclaim, a reply was interposed on November 29, 1957, in which a release in conventional form, executed by defendant and his wife under date of January 22, 1954 (prior to institution of this action on March 15, 1954) for a recited consideration of $1,170, was pleaded as "a complete defense" to defendant's alleged cause of action. Defendant thereupon filed a motion to dismiss plaintiff's petition, in which defendant admitted execution of said release and asserted that plaintiff, by pleading it in his reply, had ratified and adopted the release and that, since it contained no reservation of right to sue defendant, the release constituted "a full compromise and accord and satisfaction between the parties" and "merged and extinguished" the conflicting claims of the parties to the settlement, thus precluding plaintiff from prosecuting this suit.

At a separate hearing before the court on defendant's motion to dismiss, the uncontradicted evidence was that an adjuster for plaintiff's liability insurance carrier had made the settlement payment of $1,170 to defendant and had obtained the release of January 22, 1954, without the prior knowledge, authorization or consent of plaintiff; that, in fact, plaintiff had not heard of this settlement payment or release until informed of them by his counsel on December 14, 1957; and, that he had never authorized his insurer "or anyone else to convey away or extinguish" his cause of action against defendant. Plaintiff further stated that he had not known of defendant's counterclaim or the reply thereto until likewise informed of them by his counsel on December 14, 1957; that he had not authorized the filing of the reply; and, that he did not ratify or adopt the release pleaded in the reply. One of plaintiff's attorneys testified that, since he was aware of plaintiff's liability insurance coverage, realized that the limit of liability of plaintiff's insurer was in excess of the damages sought in defendant's counterclaim, and knew that the insurer had a policy obligation to defend against the counterclaim, he had reported to the insurer concerning the counterclaim and had been authorized and directed by the insurer "to represent them in the defense of that counterclaim." So, without notifying or consulting with plaintiff, counsel (so he said) filed the reply to defendant's counterclaim on behalf of plaintiff's insurer "as their attorney and pursuant to the provisions of (plaintiff's) insurance policy giving (his insurer) the exclusive right to control the defense of that counterclaim." At the conclusion of the hearing on December 28, 1957, defendant's motion to dismiss plaintiff's petition was overruled.

On appeal, defendant earnestly reasserts that plaintiff ratified and adopted the release by pleading it in his reply and by refiling said reply when defendant's counterclaim was refiled on January 4, 1958, and that the ratified release "constitutes an accord and satisfaction between the parties. the legal effect of which is to merge and bar the future assertion of their conflicting claims and defenses." Able counsel for the respective parties (whose excellent briefs reflect the industry and intelligence of their authors) have cited no factually analogous

case in any jurisdiction, and our research has revealed none, in which this novel point has been ruled. True, we find cases in which the facts have invoked application of the principle that the making of a settlement without express reservation of rights estops any *immediate* party to the settlement from subsequently prosecuting a claim arising out of the same accident.[1] But, in each of those cases (with a single exception to be noted), "(t)he facts lack the element of settlement by a third person (insurance carrier)." DeCarlucci v. Brasley, 16 N.J.Super. 48, 83 A.2d 823, 826. See also Tompkins Motor Lines v. Georgia Broilers, Inc., 5 Cir., 260 F.2d 830, 832. And, in the only cited case in which an insurer had made a settlement payment [Wm. H. Heinemann Creameries, Inc. v. Milwaukee Auto. Ins. Co., 270 Wis. 443, 71 N.W.2d 395, rehearing denied 270 Wis. 443, 72 N.W.2d 102], the holding was, simply stated, "that the cause of action owned by the insurer who had procured the settlement was barred by estoppel while the cause of action owned by the assured was not to be barred unless further inquiry determined that the assured had been consulted about the settlement and had participated therein * * *." Birk-

holz v. Cheese Makers Mut. Cas. Co., 274 Wis. 190, 79 N.W.2d 665, 666.

■■ A standard automobile liability insurance policy (such as that issued to instant plaintiff) specifically provides that the insurer "may make such investigation, negotiation and settlement of any claim or suit as it deems expedient," thus empowering the insurer to act independently in protecting the interests of itself and its insured.[2] However, such policy does not confer upon the insurer any express or implied authority to settle an insured's claim against a third party or otherwise prejudice the substantial rights of an insured without his knowledge or consent,[3] and the general rule is that settlement by an insurer of a *claim* against its insured, where effected without the insured's knowledge or consent and not thereafter ratified or adopted by him, does not bar an action by the insured.[4] Since the rule recognizes that an insured may be estopped from subsequent action where he ratifies or adopts a settlement by his insurer (although no such instance of ratification or adoption has been cited or found), we have in the instant case the narrow question as to whether pleading of the release in the reply to defendant's counterclaim consti-

1. Mensing v. Sturgeon, Iowa, 97 N.W.2d 145; Kelleher v. Lozzi, 7 N.J. 17, 80 A.2d 196; Wm. H. Heinemann Creameries, Inc. v. Milwaukee Auto. Ins. Co., 270 Wis. 443, 71 N.W.2d 395, rehearing denied 270 Wis. 443, 72 N.W.2d 102; Giles v. Smith, 80 Ga.App. 540, 56 S.E. 2d 806; Tompkins Motor Lines v. Georgia Broilers, Inc., 5 Cir., 260 F.2d 830. See also England v. Yellow Transit Co., 240 Mo.App. 968, 225 S.W.2d 366.

2. Bratton v. Speaks, Ky., 286 S.W.2d 526, 527(1); Wieding v. Krisch, Tex.Civ.App., 271 S.W.2d 458, 459; Haluka v. Baker, 66 Ohio App. 308, 34 N.E.2d 68, 71.

3. Burnham v. Williams, 198 Mo.App. 18, 25, 194 S.W. 751, 753; Birkholz v. Cheese Makers Mut. Cas. Co., 274 Wis. 190, 79 N.W.2d 665, 666; Wm. H. Heinemann Creameries, Inc. v. Milwaukee Auto. Ins. Co., supra, 71 N.W.2d loc. cit. 399–400; Daniel v. Adorno, D.C.Mun.App., 107 A.2d 700, 701; Jetton v. Polk, 17 Tenn.

App. 395, 68 S.W.2d 127, 131; Isaacson v. Boswell, 18 N.J.Super. 95, 86 A.2d 695, 698; Last v. Brams, 238 Ill.App. 82, 84; Perry v. Faulkner, 98 N.H. 474, 102 A.2d 908.

4. Graves Truck Line v. Home Oil Co., 181 Kan. 507, 312 P.2d 1079, 1081(2); Fikes v. Johnson, 220 Ark. 448, 248 S.W.2d 362, 364(3), 32 A.L.R.2d 934, 937(3); Klotz v. Lee, 36 N.J.Super. 6, 114 A.2d 746, 748, appeal dismissed 21 N.J. 148, 121 A.2d 369; U.S.A.C. Transport v. Corley, 5 Cir., 202 F.2d 8, 11–12(2); Foremost Dairies v. Campbell Coal Co., 57 Ga.App. 500, 196 S.E. 279; 5A Am.Jur., Automobile Insurance, § 117, p. 119. Contrast Keller v. Keklikian, 362 Mo. 919, 244 S.W.2d 1001, where the insurer had settled a *suit* against its insured and disposition of a subsequent suit by such insured was controlled by our compulsory counterclaim statute, section 509.420 RSMo 1949, 30 V.A.M.S.

tuted a ratification or adoption of the settlement effected by plaintiff's insurer on January 22, 1954.

■ Ordinarily, a release is ratified or adopted by one pleading it,[5] but the instant case presents no ordinary situation. True, the release taken by plaintiff's insurer was pleaded in a reply filed in plaintiff's name and signed by the attorneys who had represented plaintiff from the time of institution of this suit. Compare Radosevich v. Pegues, 133 Colo. 148, 292 P.2d 741. But, we are mindful that, although plaintiff's insurer was obligated by its policy to defend against the counterclaim and although plaintiff had no live financial interest in such defense because the damages sought in the counterclaim were less than the limit of the insurer's liability under its policy, the insurer could not, under our practice, have been joined as a party of record.[6] With defendant's general release in its file, plaintiff's insurer quite understandably deemed it desirable to interpose that release in bar of defendant's alleged cause of action and, in simple justice, there was no reason why the insurer should not have done so. In these circumstances, the testimony of counsel that he "filed that reply on behalf of (plaintiff's insurer) as their attorney and pursuant to the provisions of (plaintiff's) insurance policy giving (his insurer) the exclusive right to control the defense of that counterclaim" becomes as credible to us as it apparently was to the trial judge. No doubt, it would have been preferable for this to have been reflected of record in the reply,[7] but the failure to do so does not change or obscure the obvious truth that the release was pleaded for the benefit of plaintiff's insurer, not plaintiff personally. To hold otherwise would be to stick in the shell and to miss the kernel within. Furthermore, "in its genuine sense, ratification depends upon intention" [Fleming v. Anderson, Mo., 232 S.W. 718, 723—see also Restatement of Agency 2d, § 95, Comment a, p. 246]; and certainly we cannot say that the peculiar facts of this case compel the conclusion that plaintiff ever intended to ratify or adopt the release taken by his insurer. We have not overlooked the fact that, at the hearing on the motion to dismiss, defendant said that he would not have executed the release if he had "contemplated the possibility of a damage suit" against him. But, the persuasive effect of this tardy assertion is blunted by defendant's conduct in litigating plaintiff's cause of action on its merits for more than three and one-half years before belated interposition of the counterclaim which precipitated the responsive pleading of the release. We think that the trial court did not err in overruling defendant's motion to dismiss plaintiff's petition.

■ After entry of the order overruling defendant's motion to dismiss, the trial court sustained plaintiff's motion for a separate trial of the counterclaim. That action is now assigned by defendant as having been "reversibly prejudicial." Section 510.-180, subd. 2 RSMo 1949, 31 V.A.M.S., provides that a trial judge "in furtherance of convenience or to avoid prejudice may order a separate trial of any claim, crossclaim, counterclaim, or third-party claim." We recognize that, in damage suits, this discretionary power is invoked more frequently to obtain a separate trial of a cross-

5. Mechem on Agency (2nd Ed.), Vol. 1, § 446, p. 329; Restatement of Agency 2d, § 97, p. 250; Robinson v. St. Johnsbury & L. C. R. Co., 80 Vt. 129, 66 A. 814, 820, 9 L.R.A.,N.S., 1249; Jordan v. Belvin, 57 Ga.App. 719, 196 S.E. 132, 135.

6. Consult Section 379.200 RSMo 1949, 19 V.A.M.S.; State ex rel. Anderson v. Dinwiddie, 359 Mo. 980, 224 S.W.2d 985; Haines v. Harrison, 357 Mo. 956, 211

S.W.2d 489, 492. See also Cotton v. Iowa Mut. Liab. Ins. Co., 363 Mo. 400, 251 S.W.2d 246, 249, and Taverno v. American Auto Ins. Co., 232 Mo.App. 820, 112 S.W.2d 941, 944.

7. See DeCarlucci v. Brasley, 16 N.J.Super. 48, 83 A.2d 823, 825, where counsel for plaintiff's insurer identified himself of record as "attorney for plaintiff in defense of counterclaim."

claim or third-party claim,[8] and that, in many instances, an order directing a separate trial of a counterclaim would be prejudicial to defendant and wholly unjustified. See Federal Land Bank of St. Louis v. Bross, Mo.App., 122 S.W.2d 35, 40. But, after the trial court found in the instant case that the release, admittedly executed by defendant, had not been ratified or adopted by plaintiff, the counterclaim hung by a tenuous thread with no record indication that it should not be cut down by defendant's release. In this state of affairs, the trial court may not be convicted of an abuse of sound judicial discretion in ordering a separate trial of the counterclaim.

■ As upon the prior appeal, defendant again asserts that plaintiff did not make a submissible case under the humanitarian doctrine, the sole pleaded theory of negligence, and that, therefore, defendant's motion for a directed verdict at the close of the case should have been granted. Having reviewed the entire transcript on the first appeal as counsel for both parties have invited us to do, we are satisfied that our prior opinion [365 Mo. loc. cit. 1030–1031, 291 S.W.2d loc. cit. 83–84] correctly determined the issue as to submissibility of the case; and, being convinced that the variations in evidence at the two trials were not so material or substantial as to require or justify readjudication of this issue, we adhere to our previous ruling of submissibility as the law of the case. Wilson v. Toliver, Mo., 305 S.W.2d 423, 427(3).

■ Defendant's complaints about plaintiff's sole verdict-directing instruction 1 are, as summarized, (a) that it required no findings that plaintiff was oblivious and unable to escape by his own effort and (b) that, because the instruction "contained no guide whereby the jury could determine" either "how" or "when" a position of imminent peril could arise, it gave

the jury a roving commission to determine that plaintiff was in a position of imminent peril simply because he was in his Mercury on the bridge within the effective range of the headlights on defendant's Buick. The first complaint is without merit because obliviousness and inextricability have not been essential to recovery under our humanitarian doctrine since "the principal opinion in Banks v. Morris & Co., 302 Mo. 254, 257 S.W. 482, overruled prior cases which had restricted the recognized causes of peril to obliviousness and inability to escape 'and laid down the broad rule that it is of no consequence *what* brings about *or continues* the peril, even though it be sheer hardihood or recklessness. This covers the whole range of self-exposure to peril from mere negligent inattention to utter, audacious and continuing disregard of known and avoidable danger.' State ex rel. Kansas City Pub. Serv. Co. v. Bland, 354 Mo. 868, 875, 191 S.W.2d 660, 662." Dwinell v. Thompson, Mo., 243 S.W.2d 988, 990–991; Wyckoff v. Davis, Mo., 297 S.W.2d 490, 494. See also Grotjan v. Thompson, Mo.App., 140 S.W.2d 706, 708–709, and Bresler v. Kansas City Public Service Co., 239 Mo.App. 228, 234, 186 S.W.2d 524, 528.

■ Turning to the second summarized complaint, we observe that the only material findings required by plaintiff's instruction 1 were "that at the time and place in question plaintiff became and was in a position of imminent peril and danger from collision" between the two automobiles, and that defendant saw or could have seen plaintiff "in the aforesaid position of imminent peril and danger" in time thereafter to have stopped his Buick automobile and thus to have avoided a collision. Standing alone, this instruction might have been subject to the criticism leveled against plaintiff's sole verdict-directing instruction in Johnson v. St. Louis

8. Anderson v. Bell, Mo., 303 S.W.2d 93, 100–101(14); Snyder v. Jensen, Mo., 281 S.W.2d 819, 822; Biggs v. Crosswhite, 240 Mo.App. 1171, 1182, 225 S.W.

2d 514, 521(6). See also State ex rel. Algiere v. Russell, 359 Mo. 800, 223 S.W.2d 481, and Elzea v. Hammack, 241 Mo.App. 1070, 244 S.W.2d 594, 595.

Public Service Co., 363 Mo. 380, 387–388, 251 S.W.2d 70, 75–76, and, for the reasons there discussed, might have been insufficient for a proper submission. But if, when all of the instructions are read together and considered as a whole, they are harmonious, clear and complete, reversible error cannot be found because one of them, considered singly, may be defective.[9] In defendant's instruction B, "position of imminent peril" was defined properly as meaning "a place where there is certain, immediate, and impending danger—not a place where there is just a mere possibility of an injury occurring";[10] and, in defendant's instruction C, the jury was told that, *in connection with the charge submitted under (plaintiff's) instruction 1,* "the defendant was not required to stop his automobile nor to slacken its speed nor to swerve it to one side or the other until he saw, or in the exercise of the highest degree of care on his part could have seen, that plaintiff was in the path of defendant's automobile and would apparently continue to remain in its path until struck by it, and that plaintiff had thus and thereby become and· was in a position of imminent peril." Our courts have said time and again that one " 'must act on reasonable appearances' "[11] and, even more specifically, that "(i)t is the reasonable appearances of the situation that imposes the duty to act,"[12] regardless of whether or not plaintiff is oblivious. Hayes v. Coca-Cola Bottling Co. of St. Louis, Mo., 269 S.W.2d 639, 645(9); Wyckoff v. Davis, supra, 297 S.W.2d loc. cit. 496. By plaintiff's instruction 1 and defendant's instructions B and C (when read together), there was a proper, and we think adequate, submission of the instant case on the theory that plaintiff was not in a position of imminent peril, and defendant had no duty to act, until it became, or in the exercise of the highest degree of care should have become, *apparent to defendant* that plaintiff would remain in the path of defendant's approaching automobile. There having been no affirmative misdirection in plaintiff's instruction 1, whatever deficiency there may have been in that instruction was supplied and cured by defendant's instructions B and C, and the giving of instruction 1 could not have been prejudicially erroneous. Newman v. St. Louis Public Service Co., Mo., 244 S.W.2d 45, 49(4, 5). Being also of the belief that, as we have stated, there was a proper and adequate submission by all of the given instructions, when considered as a whole, we cannot find reversible error in the refusal of defendant's

9. Johnson v. Flex-O-Lite Mfg. Corp., Mo., 314 S.W.2d 75, 81–82(8); Layton v. Palmer, Mo., 309 S.W.2d 561, 570(20), 66 A.L.R.2d 1242; Banks v. Koogler, Mo., 291 S.W.2d 883, 890(21); Nelson v. O'Leary, Mo., 291 S.W.2d 142, 148 (14).

10. Blaser v. Coleman, 358 Mo. 157, 160, 213 S.W.2d 420, 421(2); Chenoweth v. McBurney, 359 Mo. 890, 894, 224 S.W.2d 114, 117(3); Dister v. Ludwig, 362 Mo. 162, 170, 240 S.W.2d 694, 699(8); Lilly v. Boswell, 362 Mo. 444, 452, 242 S.W.2d 73, 75(2); Kelley v. St. Louis Public Service Co., Mo., 248 S.W.2d 597, 602; Wilson v. Toliver, 365 Mo. 640, 285 S.W. 2d 575, 583(13).

11. See v. Wabash R. Co., 362 Mo. 489, 496, 242 S.W.2d 15, 19(6); Knorp v. Thompson, 352 Mo. 44, 62, 175 S.W.2d 889, 900; Perkins v. Terminal R. Ass'n. of St. Louis, 340 Mo. 868, 878, 102 S.W. 2d 915, 919(3); Womack v. Missouri Pac.

R. Co., 337 Mo. 1160, 1167, 88 S.W.2d 368, 371; Allen v. Kessler, Mo., 64 S.W. 2d 630, 633; Bray v. St. Louis-San Francisco Ry. Co., Mo.App., 236 S.W.2d 758, 767(12); Ramel v. Kansas City Public Service Co., Mo.App., 187 S.W.2d 492, 496 (7).

12. Turbett v. Thompson, 363 Mo. 577, 581, 252 S.W.2d 319, 321; Ukman v. Hoover Motor Express Co., Mo., 269 S.W.2d 35, 38(4); Hayes v. Coca-Cola Bottling Co. of St. Louis, Mo., 269 S.W.2d 639, 642 (4). Consult also Wabash R. Co. v. Dannen Mills, Inc., 365 Mo. 827, 288 S.W.2d 926, 929(4); Romandel v. Kansas City Public Service Co., Mo., 254 S.W.2d 585, 592(17); Stith v. St. Louis Public Service Co., 363 Mo. 442, 448, 251 S.W.2d 693, 696–697(6), 34 A.L.R. 2d 972; Knight v. Richey, 363 Mo. 293, 300, 250 S.W.2d 972, 976(7); Silver v. Westlake, Mo., 248 S.W.2d 628, 632(2); Teague v. Plaza Express Co., 354 Mo. 582, 190 S.W.2d 254, 256(2).

instruction A, directed to further definition and delimitation of a "position of imminent peril." See cases collected in West's Missouri Digest, Vol. 27, Trial, ▮▮▮

▮▮ ▮ Defendant also charges that the trial court erred in permitting witnesses Gilbert and Willey to testify concerning their experiments in stopping a 1953 Buick Roadmaster on a dry concrete pavement, without requiring a showing that such experiments had been made "with pavement (floor of bridge) littered with iron pipe and other debris, in the nighttime." Generally speaking, experimental evidence is admissible, in the sound judicial discretion of the trial court, when it is shown that the experiment was conducted under conditions substantially similar in essential particulars to the conditions prevailing at the time of the occurrence in suit.[13] However, it is not required that the conditions surrounding the experiment should have been precisely identical with those surrounding the occurrence under investigation; and, if the conditions were substantially similar, the differences in condition are for the jury in evaluating the weight to be given such evidence. Lance v. Van Winkle, 358 Mo. 143, 213 S.W.2d 401, 404(5); Carpenter v. Kurn, 348 Mo. 1132, 1138, 157 S.W.2d 213, 215. In the instant case, witness Gilbert testified that a 1953 Buick Roadmaster, running 60 miles per hour on a dry, level concrete pavement, could have been stopped in 150 feet (including the distance traveled during reaction time), and witness Willey testified to a stopping distance of 135 to 160 feet under the same conditions. With ample evidence from which the jury reasonably could have found that defendant could and should have seen plaintiff's Mercury when defendant's Buick was not less than 350 feet distant, and with undisputed proof that plaintiff's standing Mercury was about 95 feet west of the east end of the bridge and that there was no pipe or debris on the pavement east of the bridge, certainly we cannot say that experimental evidence tending to demonstrate that defendant could have stopped within 135 to 160 feet, and thus far short of the pipe and debris on the bridge, had no probative value and should have been excluded because the experiments were not conducted on a pavement littered with pipe and debris. Nor was the fact that the experimenting witnesses were expecting to be called upon to make an emergency stop such difference of condition as to demand exclusion of the proffered experimental evidence. Griggs v. Kansas City Rys. Co., Mo., 228 S.W. 508, 511–512(6); Carpenter v. Kurn, supra, 348 Mo. loc. cit. 1138, 157 S.W.2d loc. cit. 215(3).

▮ In any event, defendant is in no position to complain about plaintiff's evidence as to the stopping distance of a 1953 Buick Roadmaster running 60 miles per hour on dry, level concrete pavement, when the *first* evidence on this subject was elicited by *defendant's* counsel (during cross-examination of the investigating trooper) in response to the naked inquiry, "Can you tell us how long it would take an automobile traveling 60 miles an hour to be stopped under normal driving conditions on a good highway and with good brakes, if you have that information?" *If* there was any error in the manner in which plaintiff's evidence on this subject subsequently was developed, *it falls in the general category of self-invited error.*[14]

---

13. Lance v. Van Winkle, 358 Mo. 143, 213 S.W.2d 401, 404(4), Lynch v. Missouri-Kansas-Texas R. Co., 333 Mo. 89, 96–97, 61 S.W.2d 918, 921(3, 4); James v. Bailey Reynolds Chandelier Co., 325 Mo. 1054, 30 S.W.2d 118, 124(8); Ballman v. H. A. Lueking Teaming Co., 281 Mo. 342, 354, 219 S.W. 603, 606; 32 C.J.S., Evidence, § 590, p. 442.

14. Clark v. Crandall, 319 Mo. 87, 96, 5 S.W.2d 383, 386(7); Timmermann v. St. Louis Architectural Iron Co., 318 Mo. 421, 434, 1 S.W.2d 791, 796; Finn v. Indemnity Co. of America, Mo.App., 8 S.W.2d 1078(2); Nelson Distilling Co. v. Hubbard, 53 Mo.App. 23, 27(2).

■ In another assignment of error, defendant says that the trial court should not have admitted the experimental evidence of witnesses Gilbert and Willey as to how far ahead a dark, unlighted object would be illuminated on a clear, dry night by the headlights (on "bright") of a 1953 Buick Roadmaster. But, the only objections (not sustained) to this line of testimony by witness Gilbert were lodged after answers by the witness and are noted in this language, "Objected to by defendant's counsel and overruled by the court." Even when timely interposed, a general objection to the admissibility of evidence preserves and presents nothing for appellate review.[15] Similarly, defendant may not have appellate review of the testimony of witness Willey on the same subject, where the transcript shows no objection to such testimony[16] and consideration of defendant's present complaints concerning this evidence is neither invoked nor justified under our Rule 3.27, 42 V.A.M.S. Parmley v. Henks, Mo., 285 S.W.2d 710, 713(3).[17]

■ We come now to a series of assignments, complaining of action which, as we have concluded, in its cumulative effect was prejudicial and deprived the defendant of that fair trial which is the heritage and right of every party litigant under our system of jurisprudence. The first such assignment is directed to the reception in evidence of six *colored* photographs of plaintiff's injured right foot and of his left thigh (from which skin had been grafted onto the right heel), two of said photographs having been taken six months subsequent to the accident and four of them one year subsequent to the accident. After defendant's objection that these photographs were "highly inflammatory * * * purporting to show bloody scabs in high and unrealistic colors designed to prejudice and inflame the jury" had been overruled, the photographs were admitted upon identification only by plaintiff that they were "fair and accurate representations" of the extremities shown. Although opposing counsel agree that this is the first case in Missouri which has called for appellate discussion of *colored* photographs, we find mention of such photographs in numerous cases from other states.[18] Implicit in all of these cases is the thought that there is no logical reason why colored photographs should not be used in evidence, subject to the same limitations and restrictions as black and white photographs [State v. Huff, 14 N.J. 240, 102 A.2d 8, 13; Commonwealth v. Makarewicz, 333 Mass. 575, 132

---

15. Stutte v. Brodtrick, Mo., 259 S.W.2d 820, 824(3); Hoffman v. St. Louis Public Service Co., Mo., 255 S.W.2d 736, 742(7); Goodman v. Allen Cab Co., 360 Mo. 1094, 232 S.W.2d 535, 539(3).

16. Sandler v. Schmidt, Mo., 263 S.W.2d 35, 40(9); LeGrand v. U-Drive-It Co., Mo., 247 S.W.2d 706, 714(13); Reger v. Nowotny, Mo., 226 S.W.2d 596, 598 (8).

17. Concerning the admissibility of such evidence, see Hall v. Hannibal-Quincy Truck Line, Mo., 211 S.W.2d 723, 727 (5), and Lindsey v. Rogers, Mo.App., 220 S.W.2d 937, 940-941(6).

18. Knox v. City of Granite Falls, 245 Minn. 11, 72 N.W.2d 67, 72-73(9-10), 53 A.L.R.2d 1091; Roring v. Hoggard, Okl., 326 P.2d 812, 815(7); Anderson v. Evans, 164 Neb. 599, 83 N.W.2d 59, 68 (21); State v. Bischert, 131 Mont. 152, 308 P.2d 969, 972-973(6, 7); State v.

Huff, 14 N.J. 240, 102 A.2d 8, 13(15); Commonwealth v. Makarewicz, 333 Mass. 575, 132 N.E.2d 294, 299(4); State v. Kuhnhausen, 201 Or. 506, 272 P.2d 225, 246(19); State v. Nunn, 212 Or. 546, 321 P.2d 356, 366(16); State v. Michel, 225 La. 1040, 74 So.2d 207, 215(24), affirmed 350 U.S. 91, 76 S.Ct. 158, 100 L. Ed. 83, rehearing denied 350 U.S. 955, 76 S.Ct. 340, 100 L.Ed. 831; State v. McMullan, 223 La. 629, 66 So.2d 574, 575(1); State v. Iverson, 77 Idaho 103, 289 P.2d 603, 607(11); Armijo v. People, 134 Colo. 344, 304 P.2d 633, 638(10); People v. Carter, 48 Cal.2d 737, 312 P.2d 665, 673(9, 10); People v. Moore, 48 Cal.2d 541, 310 P.2d 969, 972(1); People v. LaVerne, 148 Cal.App.2d 605, 307 P.2d 31, 36(8); Fields v. State, Okl.Cr., 284 P.2d 442, 452, 453(14); Wisniewski v. State, Del., 138 A.2d 333, 337(4, 5); Cordero v. State, 164 Tex.Cr.R. 160, 297 S.W.2d 174, 177(4).

N.E.2d 294, 299], and with that concept we are in entire agreement. However, a pioneer scholar and textbook authority in the field of photographic evidence appropriately points out that "the vital, mirror-like appearance of a photograph makes it capable of inciting passions and prejudices of a jury" and that "(t)he danger in this respect increases as photography improves" [Scott on Photographic Evidence (1942), § 601, loc. cit. 475]; and, courts dealing with colored photographs have sounded a caveat that "such evidence should be faithful and accurate" [People v. Moore, 48 Cal.2d 541, 310 P.2d 969, 972] and that "caution must be exercised in admitting colored photographs which may tend to exaggerate the seriousness and extent of wounds or burns." Knox v. City of Granite Falls, 245 Minn. 11, 72 N.W.2d 67, 73, 53 A.L.R.2d 1091.

 We rule this assignment of error with recognition and reaffirmation of the principle that much should be left to the sound judicial discretion of the trial judge in determining the admissibility of photographs.[19] But, the doctrine of due deference to the trial court in discretionary matters is not to be self-administered by appellate courts to anesthetize against sensitivity to prejudicial error or employed by counsel to neutralize all such error; and we observe that, in cases involving ordinary black and white photographs, our courts properly have concerned themselves not only with appropriate identification of the particular photograph as a true and accurate portrayal of that which it purports to show but also with the question of whether the photograph was prejudicial and inflammatory.[20] As for the six colored photographs in the instant case, we have had sufficient familiarity with male limbs

to know that the limbs shown in these photographs are not portrayed in their *natural color* (and certainly the same is true with respect to the backgrounds), and we have had sufficient experience in trial practice (inept as we may have been in that field) to perceive the probable inflammatory impact of such photographs depicting sympathy-provoking injuries in "high and unrealistic colors." " 'A defendant, in an action for damages for personal injury, suffers many unavoidable disadvantages, which makes it only the more necessary to shield him from those which may be avoided. The maimed, the widow, and the orphan draw strongly enough on the hearts of jurymen without affirmative effort to arouse sympathy. Human nature needs no artificial aid in this respect.' " Taylor v. Kansas City Southern Ry. Co., 364 Mo. 693, 699, 266 S.W.2d 732, 736; Riepe v. Green, Mo.App., 65 S.W.2d 667, 668. See Fitzpatrick v. St. Louis-San Francisco Ry. Co., Mo., 327 S.W.2d 801. Retrial of this case resulted in a jury verdict for $20,000 which, as defendant contends and as we believe, was not supported by the fragmentary and meager medical evidence in the record, so we do not have here a case in which it may be said that error in admission of photographs of plaintiff's injuries must have been harmless. Contrast Anderson v. Bell, Mo., 303 S.W.2d 93, 100 (13). Upon the first trial of this case, the six colored photographs under discussion were excluded although then identified by the photographer who took them. Having examined and re-examined, considered and reconsidered, these six colored photographs, we are constrained to conclude that their probable inflammatory and prejudicial effect far outweighed their potential evidentiary or probative value [cf. People v.

19. Gray v. St. Louis-San Francisco Ry. Co., 363 Mo. 864, 254 S.W.2d 577, 584 (7); Boulos v. Kansas City Public Service Co., 359 Mo. 763, 223 S.W.2d 446, 452(7); Petty v. Kansas City Public Service Co., 354 Mo. 823, 191 S.W.2d 653, 658(13). See also Brock v. Gulf, Mobile and Ohio R. Co., Mo., 270 S.W.2d 827, 833(11).

20. Lynch v. Baldwin, Mo., 117 S.W.2d 273, 276(7); Lackey v. Missouri & K. I. Ry. Co., 305 Mo. 260, 267, 264 S.W. 807, 809; Boulos v. Kansas City Public Service Co., supra, 223 S.W.2d loc. cit. 452. Consult also Hutchison v. Moerschel Products Co., 234 Mo.App. 518, 133 S.W.2d 701, 706.

Carter, 48 Cal.2d 737, 312 P.2d 665, 673] and that they likewise should have been excluded when offered upon the second trial.

In urging an adequate award to his client, plaintiff's counsel said, in his closing argument, "What is a dollar worth? Stan Musial gets $100,000 a year for playing baseball"; and, after prompt objection to that argument had been overruled, counsel continued, "Ted Williams gets $125,000 per year, they are the best. The average professional baseball player gets $25,000 to $30,000 in one year playing ball." On appeal, plaintiff asserts that this argument was proper because it "simply went toward the present-day purchasing power of a dollar." We agree that counsel may direct the jury's attention to the decreased purchasing power of the dollar [Evans v. General Explosives Co., 293 Mo. 364, 378, 239 S.W. 487, 492(10); Banks v. St. Louis Public Service Co., Mo.App., 249 S.W.2d 481, 485(7)], but the quoted statements certainly cannot be justified on any such theory. Even the casual reader of the sports page understands that Musial and Williams have been able to command salaries in the financial stratosphere, not because of the decreased purchasing power of the dollar but rather because of the multitudes of admirers drawn through the turnstiles by these exceptionally talented, proficient and colorful personalities. There was no evidence in this case (and we have read nothing which indicates) that "the average professional baseball player" is paid $25,000 to $30,000 per year. Furthermore, instant plaintiff is a service station attendant, not a professional baseball player. Counsel should neither argue nor draw inferences from matters not in evidence. Reese v. Illinois Terminal R. Co., Mo., 273 S.W.2d 217, 225(11). The quoted statements were outside the periphery of fair and legitimate argument, and objection thereto should have been promptly sustained.

Two sentences later, plaintiff's counsel said, "We are certainly not moti-

vated by any desire to place a hardship upon Mr. Washam (defendant) personally." Although an objection to this statement was sustained, defendant's motion to discharge the jury and declare a mistrial was denied; and when, failing that, a request was made that plaintiff's counsel be reprimanded, the court responded, "Objection sustained, the jury will disregard it; proceed." The quoted argument was in no wise permissible under the evidence [contrast Moss v. Mindlin's, Inc., Mo., 301 S.W.2d 761] or retaliatory in nature [contrast Nelson v. O'Leary, Mo., 291 S.W.2d 142, 150(18)], but it was grossly and patently improper, particularly so when adroitly injected into the very heart of a plea for an adequate award. Buehler v. Festus Mercantile Co., 343 Mo. 139, 119 S.W.2d 961, 967–970; Rytersky v. O'Brine, 335 Mo. 22, 70 S.W.2d 538, 540–541. True, an objection to this statement was sustained, but we are by no means satisfied that the error was cured by the mild and perfunctory ruling of the court. Rytersky v. O'Brine, supra, 70 S.W.2d loc. cit. 541(7). "The evil effect of such matters is not always cured by the ruling of the court withdrawing them from consideration or even by rebuking counsel. The red hot iron of prejudice has been thrust into the case; merely withdrawing it still leaves a festering wound." O'Hara v. Lamb Const. Co., Mo.App., 197 S.W. 163, 165; Calloway v. Fogel, 358 Mo. 47, 54, 213 S.W.2d 405, 409. "It is exceedingly difficult to withdraw from the minds of jurors * * suggestions of immaterial facts, insinuations of misleading rules of action, or arguments which arouse passion or prejudice; and yet * * * it is only when it is certain that these have been withdrawn that the trial is fair and impartial." Union Pac. R. Co. v. Field, 8 Cir., 137 F. 14, 16; London Guar. & Acc. Co. v. Woelfle, 8 Cir., 83 F.2d 325, 340.

One sentence later in a climactic appeal for an adequate award, counsel argued: "In considering what is an adequate sum for this young man, suppose I was to meet one of you ladies on the street and I

say to you, 'I want to offer you a job and I want to tell you a little bit about this job before you say you are going to accept it; one peculiar thing, if you take it you have to keep it for the rest of your life, you work seven days a week, no vacations, work daytime and night. The other thing is, you only get paid $3.00 a day. Here is your job—your job is to suffer Mr. Faught's disability.'" The objection of defendant's counsel "to this highly improper, prejudicial and inflammatory argument" was, in effect, overruled by the court's comment that "the jury will regard these arguments purely as arguments, and not as evidence in this case" [Hancock v. Crouch, Mo.App., 267 S.W.2d 36, 44(12)]; and, with this argument thus approved, plaintiff's counsel in substance repeated it. The quoted "job offer" was a tandem plea (a) that the jurors put themselves in plaintiff's place and (b) that they employ a so-called mathematical formula in assessing his damages for pain and suffering. Standing alone, an appeal to jurors to put themselves in plaintiff's place does not always constitute reversible error, particularly where the trial court has taken effective action with respect thereto [21] or where there is no complaint on appeal that the verdict was excessive [Sparks v. Auslander, 353 Mo. 177, 186, 182 S.W.2d 167, 172–173 (10)], but this character of plea is consistently condemned and uniformly branded as improper,[22] the rationale of rejection being

that a juror "doing that would be no fairer judge of the case than would plaintiff" himself [F. W. Woolworth Co. v. Wilson, 5 Cir., 74 F.2d 439, 442, 98 A.L.R. 681] and that such "argument, in effect, affirms as a correct principle that a man may properly sit in judgment on his own case—an idea abhorrent to all who love justice" and not "given a cloak of respectability by associating it with the Golden Rule" because that Rule "applies in favor of the defendant as well as the plaintiff." Red Top Cab Co. v. Capps, Tex.Civ.App., 270 S.W.2d 273, 275.

■ From time immemorial, the judicial measure of damages for pain and suffering has been fair and reasonable compensation [see Rigley v. Prior, 290 Mo. 10, 24–26, 233 S.W. 828, 832], because there is and can be no established standard, fixed basis, or mathematical rule by which such damages may be calculated. Porter v. Chicago, B. & Q. R. Co., 325 Mo. 381, 391, 28 S.W.2d 1035, 1039; Brennecke v. Ganahl Lumber Co., 329 Mo. 341, 356, 44 S.W.2d 627, 634. Only within the past few years have resourceful and ingenious counsel developed the "trial technique" of appealing to the jury to follow a mathematical formula in admeasuring damages for pain and suffering. Cases in this jurisdiction have gone no further than to hold that counsel's "mere argumentative suggestion" of a lump sum does not constitute reversible error,[23]

21. Stewart v. Boring, Mo., 312 S.W.2d 131, 134–135; Warning v. Thompson, Mo., 249 S.W.2d 335, 343(14), 30 A.L.R.2d 1176; Crockett v. Kansas City Rys. Co., Mo., 243 S.W. 902, 908. Consult also Williamson v. St. Louis Public Service Co., 363 Mo. 508, 252 S.W.2d 295, 303 (16).

22. Stewart v. Boring, supra, 312 S.W. 2d loc. cit. 135; Crockett v. Kansas City Rys. Co., supra, 243 S.W. loc. cit. 908; Haake v. G. H. Dulle Milling Co., 168 Mo.App. 177, 180–181, 153 S.W. 74, 75; Chicago & N. W. Ry. Co. v. Kelly, 8 Cir., 84 F.2d 569, 576; F. W. Woolworth Co. v. Wilson, 5 Cir., 74 F.2d 439, 442(6), 98 A.L.R. 681; Russell v. Chicago, R. I. & Pac. R. Co., 249 Iowa 664, 86 N.W.2d 843, 848(9); Murphy v.

Cordle, 303 Ky. 229, 197 S.W.2d 242, 243; Mortensen v. Bradshaw, 188 Mich. 436, 154 N.W. 46, 47; Wells v. Ann Arbor R. Co., 184 Mich. 1, 150 N.W. 340, 344(3); Morrison v. Carpenter, 179 Mich. 207, 146 N.W. 103, 111(8); Red Top Cab Co. v. Capps, Tex.Civ.App., 270 S.W.2d 273, 275(2); Kahn v. Green, Tex. Civ.App., 234 S.W.2d 131, 132–133(2); Texas Coca Cola Bottling Co. v. Lovejoy, Tex.Civ.App., 112 S.W.2d 203, 204; Allen v. Denk, Tex.Civ.App., 87 S.W.2d 303, 306(8); 88 C.J.S., Trial, § 191, loc. cit. 376; 53 Am.Jur., Trial, § 496, p. 401.

23. Dean v. Wabash R. Co., 229 Mo. 425, 455, 129 S.W. 953, 962(18); Smith v. Kansas City Rys. Co., Mo.App., 204 S.W. 575, 576(4). But, see Votrain v. Illinois Terminal R. Co., Mo., 268 S.W.2d

and no Missouri case discussing the so-called mathematical formula technique has been cited or found.[24] Among other appellate courts, by whom this technique has been considered, there is a sharp cleavage, some approving[25] and some disapproving,[26] with no strong preponderance either way.

■ To us, the considerations advanced by the authorities disapproving the mathematical formula argument are more persuasive. Whatever may be the cold logic or academic theory of the matter, the ungilded reality is that such argument is calculated and designed to implant in the jurors' minds definite figures and amounts not theretofore in the record (and which otherwise could not get into the record) and to influence the jurors to adopt those figures and amounts in evaluating pain and suffering and in ad-measuring damages therefor. *If an argument* of this character is permissible and proper, it would be just as logical, and equally as fair, to permit "expert witnesses" to evaluate pain and suffering on a per diem or per hour basis—a revolutionary innovation which, so far as we are advised, not even the most ardent zealots of the mathematical formula technique have (as yet) proposed. Henne v. Balick, Del., 146 A.2d 394, 398; Botta v. Brunner, 26 N.J. 82, 138 A.2d 713, 722–723, 60 A.L.R.2d 1331. The contention of its advocates that the mathematical formula argument is nothing more

838, 844, where the trial court "promptly sustained" an objection to counsel's mention of a lump sum.

24. Neither the points briefed on appeal nor our opinion in Bone v. General Motors Corp., Mo., 322 S.W.2d 916, 924, reached the propriety of a jury appeal that damages for pain and suffering be admeasured on a mathematical formula.

25. Ratner v. Arrington, Fla.App., 111 So. 2d 82; Four-County Electric Power Ass'n. v. Clardy, 221 Miss. 403, 73 So. 2d 144, 151–152, 44 A.L.R.2d 1191; Arnold v. Ellis, 231 Miss. 757, 97 So.2d 744, 747(2); McLaney v. Turner, 267 Ala. 588, 104 So.2d 315, 322–323; Boutang v. Twin City Motor Bus Co., 248 Minn. 240, 80 N.W.2d 30, 39(19) (use "for purely illustrative purposes" permitted); Flaherty v. Minneapolis & St. Louis R. Co., 251 Minn. 345, 87 N.W.2d 633, 635(4, 5) (following the Boutang case, supra). Other cases often cited (some in instant plaintiff's brief) are not authority for the so-called mathematical formula argument. In Imperial Oil, Ltd. v. Drlik, 6 Cir., 234 F.2d 4, 11 (13), the reviewing court simply found that the result reached by the trial judge in a *court-tried* case was not "manifestly unjust" as a matter of law. In J. D. Wright & Son Truck Line v. Chandler, Tex.Civ.App., 231 S.W.2d 786, 789(6), and in Braddock v. Seaboard Air Line R. Co., Fla., 80 So.2d 662, 668, no objection was made to the mathematical formula argument. In Magnolia Petroleum Co. v. Herman, Tex.Civ.App., 295 S.W.2d 430, 431, the opinion plainly shows that a *lump sum* was asked for

"personal injury"; and, in several other cases [Aetna Oil Co. v. Metcalf, 298 Ky. 706, 183 S.W.2d 637, 639; Kindler v. Edwards, 126 Ind.App. 261, 130 N.E. 2d 491, 492–493(1); Haley v. Hockey, 199 Misc. 512, 103 N.Y.S.2d 717, 718 (2); Haycock v. Christie, 101 U.S.App. D.C. 409, 249 F.2d 501, 502(2, 3)], the reported opinions do not reveal whether the amount sought as damages for pain and suffering was calculated by use of a mathematical formula or was simply a lump sum, and there was no discussion whatever of the mathematical formula technique.

26. Botta v. Brunner, 26 N.J. 82, 138 A. 2d 713, 718–726, 60 A.L.R.2d 1331; Purpura v. Public Service Elec. & Gas Co., 53 N.J.Super. 475, 147 A.2d 591; Henne v. Balick, Del., 146 A.2d 394; Warren Petroleum Corp. v. Pyeatt, Tex.Civ.App., 275 S.W.2d 216, 218(2); Ahlstrom v. Minneapolis, St. Paul & Sault Ste. M. R. Co., 244 Minn. 1, 68 N.W.2d 873, 890–891(17). Consult also Wuth v. United States, D.C.Va., 161 F.Supp. 661, 663–664(3) (a court-tried case); Hallada v. Great Northern Railway, 244 Minn. 81, 69 N.W.2d 673, 687; Chicago & N. W. Ry. Co. v. Candler, 8 Cir., 283 F. 881, 884–885, 28 A.L.R. 1174; Bostwick v. Pittsburgh Rys. Co., 255 Pa. 387, 100 A. 123; Stassun v. Chapin, 324 Pa. 125, 188 A. 111(3); Cooley v. Crispino, 21 Conn.Super. 150, 147 A.2d 497, 498–499(5, 6); Gorczyca v. New York, New Haven & Hartford R. Co., 141 Conn. 701, 109 A.2d 589, 590(1). For law review notes on the Botta case, supra, see 4 Villanova L.Rev. 137, 12 Rutgers L. Rev. 522, and 19 Ohio St.L.J. 780.

than that and is not evidence and that the fancied danger of its being mistaken for or accepted as evidence is greatly magnified and exaggerated by the timorous is a contention sound and plausible without but hollow and specious within. "The proof of the pudding is in the eating," and we find no more incisive and devastating critique of the mathematical formula argument than the action of a Dade County, Florida, jury in returning a verdict for $248,439, the precise amount sought by counsel in a mathematical formula argument, and the action of the Supreme Court of Florida in affirming that judgment without opinion. Seaboard Air Line R. Co. v. Braddock, Fla., 96 So.2d 127. As the Supreme Court of New Jersey warned in passing, "(i)f the day ever arrives when that type of speculation becomes accepted by the courts generally as a fair mathematical factor for use by juries, proponents of the view that motor vehicle accident injury claims should be treated on some basis similar to workmen's compensation, will have grist for their mill." Botta v. Brunner, supra, 138 A.2d loc. cit. 723. See Becksted v. Skelly Oil Co., D.C.Minn., 131 F.Supp. 940, 944. Without further extending this already long opinion by discussion of other reasons advanced in support of and in opposition to the mathematical formula argument, we agree that "(m)uch emotional reasoning can be advanced for the thesis proposed in behalf of injured plaintiffs. But in our search for equal opportunity in the trial of cases for the contending parties to offer their proof and submit their arguments thereon, the practice (of mathematical formula argument) cannot be justified." Botta v. Brunner, supra, 138 A.2d loc. cit. 724.

■ Trial techniques may come and go, but the motivating emotions and besetting frailties of courts, counsel and jurors do not change. It is as true today, as it was a few years ago, that pain and suffering are not capable of precise monetary evaluation either by witnesses or counsel, and that "(t)he question in any given case is not what it would cost to hire some one to undergo the measure of pain alleged to have been suffered (or to be suffered) by the plaintiff, but what, under all the circumstances, should be allowed the plaintiff in addition to the other items of damage to which he is entitled, in consideration of suffering necessarily endured." Goodhart v. Pennsylvania R. Co., 177 Pa. 1, 35 A. 191, 192; Littman v. Bell Telephone Co. of Pa., 315 Pa. 370, 172 A. 687, 691. In our considered judgment, the "job offer" argument of counsel for instant plaintiff was mischievously unfair not only because it appealed to the jurors to put themselves in plaintiff's place but also because it invited them to admeasure damages on a mathematical formula.

■ Without undertaking to determine whether any single matter of which we have treated, standing alone, would constitute reversible error [Section 512.160, subd. 2 RSMo 1949, V.A.M.S.], we are firmly of the opinion that, in their totality, they do. Myers v. Moffett, Mo., 312 S.W.2d 59, 65; Ryan v. United Parcel Service, 2 Cir., 205 F.2d 362, 365. See also Ritchie v. Burton, Mo.App., 292 S.W.2d 599, 610(20). For the cumulative prejudicial effect of the errors discussed, the judgment is set aside and the cause is remanded.

STORCKMAN, P. J., and EAGER, J., concur.